UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES VAN EPEREN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-13008-MAP |
| | ) | |
| MASSACHUSETTS MUTUAL | ) | |
| LIFE INSURANCE, CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| MASSACHUSETTS MUTUAL | ) | |
| LIFE INSURANCE CO., | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES VAN EPEREN, et al., | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |
| ———————————————— | ) | |

REPORT AND RECOMMENDATION REGARDING
COUNTERCLAIM DEFENDANT RITA HILL'S MOTION TO DISMISS
(Dkt. No. 85)

ROBERTSON, U.S.M.J.

I.    Introduction

Plaintiff and counterclaim defendant James Van Eperen ("Van Eperen"), a resident of

Maryland, was a general agent for defendant and counterclaim plaintiff Massachusetts Mutual

Life Insurance, Co. ("MassMutual"), a mutual life insurance company with its principal place of

business in Springfield, Massachusetts, before MassMutual severed the parties' relationship.

Van Eperen filed suit against MassMutual and certain of its affiliates in Massachusetts state

court, and MassMutual removed the action to this court on the basis of federal question jurisdiction (Dkt. No. 1).  In an amended complaint, Van Eperen alleges that MassMutual wrongfully terminated him in retaliation for his reporting to it of possible violations of Financial Industry Regulation Authority ("FINRA") rules by a career agent under his supervision (Dkt. No. 7).  Van Eperen also alleges that MassMutual wrongfully classified him as an independent contractor rather than an employee, refused to pay him wages and other compensation owed to him, and filed a document containing false and disparaging statements about him with FINRA (*id*.).  Van Eperen asserts claims against MassMutual for violations of the whistleblower protections of the Dodd-Frank Wall Street Reform and Consumer Protection Act (15 U.S.C. § 78u-6), the Massachusetts Independent Contractor Statute (Mass. Gen. Laws ch. 149, § 148B), the Massachusetts Wage Act (*id*. at § 148), and the Massachusetts Consumer Protection Statute (Mass. Gen. Laws ch. 93A), as well as for breach of contract, breach of the covenant of good faith and fair dealing, defamation, and a number of other common law torts.

MassMutual denies Van Eperen's allegations and claims and avers that it terminated its relationship with Van Eperen upon learning that he and others, including counterclaim defendant Rita Hill, a resident of Tennessee, had engaged in a scheme to defraud MassMutual of millions of dollars in commissions and other payments in connection with the sale of life insurance. MassMutual details the alleged scheme in an amended counterclaim sounding in diversity and asserts claims against Van Eperen and Hill for fraud, negligent misrepresentation, fraud in the inducement, and civil conspiracy, and against Van Eperen alone for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment, as well as additional counts of fraud and negligent misrepresentation (Dkt. No. 17).

Hill has moved to dismiss MassMutual's amended counterclaim as against her for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  She also seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(3) for improper venue, Fed. R. Civ. P. 12(b)(4) and (5) for insufficient process and service of process, and Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted and on statute of limitations grounds (Dkt. No. 85).  The district judge referred Hill's motion to the undersigned for report and recommendation (Dkt. 98).  For the reasons set forth below, this court recommends that Hill's motion be DENIED.

II.     Facts[1]

    A.   The Amended Counterclaim

MassMutual is a diversified financial services organization offering life insurance and other financial products and services with a principal place of business in Springfield, Massachusetts (Dkt. No. 17 at ¶ 3).  MassMutual contracts with individuals known as "general agents" to sell its life insurance (*id.* at ¶¶ 4, 11).  The counterclaim complaint alleges that general agents are independent contractors who operate independent agencies that are affiliated with MassMutual (*id.* at ¶ 4).  General agents may solicit and submit applications for MassMutual life insurance directly or through individuals with whom they sub-contract, including individuals known as "career agents" (*id.* at ¶¶ 12, 20).  MassMutual requires that all agents involved in the solicitation and submission of MassMutual life insurance applications be contracted with it or

---

[1] "In considering a motion to dismiss for absence of personal jurisdiction, the court will 'accept the allegations in the complaint as true and construe the facts in the light most favorable to the plaintiff." *Micro Estimating Systems, Inc. v. Laurentec, LLC*, No. 12-cv-30107-MAP, 2013 WL 1330996, at * 1 (D. Mass. Mar. 29, 2013) (quoting *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 24 (1st Cir. 2008)).  This is the same standard as the court uses in the Fed. R. Civ. P. 12(b)(6) context. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (citing *Tasker v. DHL Rev. Sav. Plan*, 621 F.3d 34, 38 (1st Cir. 2010)).

with a MassMutual agent (*id*. at ¶ 11).

MassMutual relies on its general agents and career agents to ensure that the information in applications for its life insurance is accurate and complete and that applications are submitted in accordance with its policies and procedures, so that its underwriters are able to correctly assess the risks of proposed policies (*id*. at ¶¶ 16-18).  Because MassMutual's compensation and premium structure, like that of most life insurance companies, is such that it does not begin to make money on most policies until a number of years after their issuance, its underwriters need to be able to evaluate factors bearing on policy longevity, such as the applicant's age and health, as well as the applicant's financial ability to continue to make premium payments over the long term and intentions of doing so (*id*. at ¶ 14).  The "soliciting producer," the agent responsible for soliciting an application and gathering the requisite information from a proposed insured (including the applicant's medical history, finances, proposed method of paying for the policy, and purpose for seeking the policy, including any uses the applicant intends to make of the policy or the death benefit), must sign the application (*id*. at ¶¶ 11, 13, 17).  MassMutual also requires the agent to include with the application a statement, known as a "producer's statement," setting forth any compensation arrangements that exist with respect to the proposed policy and disclosing the names of all agents who will receive commission payments if MassMutual issues the policy and the percentages thereof (*id*. at ¶¶ 11, 17, 51).

Policies that involve premium financing –  a practice whereby the insured borrows the money, typically from a bank, to pay the cost of life insurance premiums – entail greater risks than policies that are funded directly by the insured.  Among those risks are the possibilities that the insured becomes unable to make the required loan payments and the policy lapses prematurely or that the insured is backed by investors who are seeking to arbitrage the insured's

life expectancy to profit at MassMutual's expense (*id.* at ¶ 15, 33).  Premium financing can be appropriate in certain circumstances, however, and MassMutual has approved applications involving premium financing for high net-worth individuals who have a legitimate need for large life insurance policies and the assets to support their ability to pay premiums over the long run, but who choose premium financing so as to free up their liquid assets for other purposes (*id.* at ¶ 32).  Withal, due to the greater risks, MassMutual subjects applications involving premium financing to an extra level of review in the underwriting process and will only issue a premium financed policy after a specialist in premium financing reviews and approves the application (*id.* at ¶¶ 34-35).

Commencing in January 2005, Van Eperen, who directed a financial services agency headquartered in Bethesda, Maryland, became a general agent for MassMutual (*id.* at ¶ 5). Under the general agent contract between Van Eperen and MassMutual, Van Eperen agreed that his primary business would be "performing the duties, responsibilities and undertakings set forth" therein, and that, in so doing, he assumed duties of loyalty to, and fair and honest dealing with, MassMutual, and would comply with all of MassMutual's written rules, policies, and procedures, as well as all applicable laws and regulations (Dkt. No. 17-1 at ¶¶ 5, 12, 36).  Van Eperen was authorized under the contract to solicit and submit applications for MassMutual insurance policies, annuity contracts, and other products, both personally and through individuals with whom he sub-contracted as provided in the agreement, including career agents (*id.* at ¶ 2). Contracts with career agents were required to be on forms furnished by MassMutual and were subject to MassMutual's approval (*id.* at ¶ 1).  Van Eperen agreed to supervise the activities of career agents with whom he sub-contracted in accordance with written requirements specified by MassMutual and to "exercise his … best efforts to ensure that all individuals employed by or

under contract with him … compl[ied] with all laws, regulations, rules and [MassMutual] policies and procedures" (*id*. at ¶ 6).  MassMutual agreed to pay his sub-contracted career agents all commissions earned under their sub-contracts, either directly or on behalf of Van Eperen (*id*. at ¶ 14).  MassMutual also agreed to compensate Van Eperen on his personal production by paying him commissions, as well as on business submitted by his producers by paying him "overrides, service fees and other remuneration," with all such compensation to be in accordance with schedules published by MassMutual (*id*. at ¶ 15).

From November 2010 through January 2012, Hill was a MassMutual career agent for Van Eperen (Dkt. No. 17 at ¶ 6).  The career agent contract between Van Eperen and Hill, which is dated November 3, 2010, is on a form provided by MassMutual, which is identified at the head of the agreement as a Springfield, Massachusetts company (Dkt. No. 17-2).  Under the contract, Hill agreed that her principal business activity would be the solicitation of applications for MassMutual insurance and annuity business, subject to minimum production requirements published by MassMutual (*id*. at ¶¶ 3, 9, 15).  Hill agreed to comply with MassMutual's and Van Eperen's rules in carrying out her business activities and to promptly forward to Van Eperen all applications, related papers, and monies she received in connection therewith (*id*. at ¶¶ 3-4).  In return, Van Eperen was to allow Hill to be paid the commissions on her production in accordance with schedules published by MassMutual, which were incorporated by reference into the agreement (*id*. at ¶¶ 6-7).

MassMutual provided both Van Eperen and Hill with its Producer Compliance Manual, a document setting forth MassMutual's policies and procedures for its career agents (Dkt. No. 17 at ¶ 28).  In it, MassMutual advised career agents that it "must have access to all relevant information" concerning a policy application; that the "accurate completion of the application,

6

any questionnaires, and the Producer's Statement is critical to the underwriting process;" and that it "relies on [career agents] for a careful, honest and thorough presentation of the facts necessary for the proper classification of risks" (*id*. at ¶ 29).  Included in the manual were requirements that: (1) career agents provide MassMutual "with all information supplied [by the applicant or others in relation to the policy," along with "any information [the career agent has] which bears on the application, particularly any information regarding the proposed insured's health, circumstances, other policies, or overall insurability, even if this [information] is not recorded on the application;" (2) "[a]ll information on the application and related forms, including the Producer's Statement, … be accurate and complete to the best of [the career agent's] knowledge and belief;" (3) "[i]f an application is not taken in person, a [career agent must] indicate this fact in the Remarks section of the Producer's Statement;" (4) "the Soliciting Producer be shown on all insurance applications;" (5) "any commission splits [a career agent] enter[s] into should reflect [the career agent's] relative involvement in the sale; and (6) a career agent "cannot simply sign an application that an unlicensed/unregistered agent has already completed … [a] practice [known as] 'fronting' [a career agent's] license for the unlicensed/unregistered person [that] is fraudulent" (*id*. at ¶ 30).

Hill worked out of an office in Tennessee along with an individual named Edward Netherland (*id*. at ¶ 38).[2]  Shortly before Hill signed on as a MassMutual career agent, in September 2010, Netherland, with Van Eperen's assistance, approached MassMutual to promote an annuity-based premium financing structure he called "Trifecta" (*id*. at ¶ 39).  According to Netherland and Van Eperen, Trifecta would allow insureds to obtain free life insurance by

---

[2] MassMutual also named Edward Netherland as a counterclaim defendant, but Mr. Netherland died in November 2014 and was dismissed from the case (Dkt. Nos. 36, 46, 54).

coupling premium financing with the purchase of annuities in such a way as to allow the insureds to use loan proceeds and annuity income to make premium payments (*id*. at ¶¶ 38-39).  On November 5, 2010 – two days after Hill entered into the MassMutual career agent contract – MassMutual informed Netherland and Van Eperen in writing that the company was not interested in Trifecta "[b]ecause of financial concerns … with our retail products as the principal funding mechanism" (*id*. at ¶ 42).  Netherland shared that email communication with Hill, who, unbeknownst to MassMutual at the time, had been working with Netherland and Van Eperen behind the scenes, providing information and assistance to them as they tried to sell MassMutual on Trifecta (*id*. at ¶¶ 38, 42).  MassMutual also separately advised Van Eperen that it was unlikely ever to do business with Netherland based on Netherland's reputation in the industry – backed by a prior experience MassMutual had with Netherland pitching another premium financing scheme only a few months earlier – for pushing proposals that appeared to be designed to profit from the insured's life expectancy (*id*. at ¶ 41).  Van Eperen requested that MassMutual reconsider its rejection of Trifecta, but, on January 6, 2011, MassMutual confirmed to Van Eperen that it was not interested in Trifecta or in working with Netherland (*id*. at ¶ 44).

In December 2010, Hill, through Van Eperen's agency, submitted an application for MassMutual life insurance for one Allin M. Karls, which she signed as the soliciting producer (*id*. at ¶ 45).  While the application disclosed that the proposed policy was to be premium financed, it did not mention that it was to utilize the Trifecta annuity-based scheme that MassMutual had just rejected (*id*.).  Once the application was submitted and under review, Van Eperen, along with his new business coordinator, communicated with MassMutual underwriters in an effort to induce MassMutual to approve the application and issue the Karls policy (*id*. at ¶ 46).  Included among the topics of discussion was the proposed premium financing of the policy;

Van Eperen provided explanations and documents to MassMutual on the topic, but did not disclose the planned use of the rejected Trifecta annuity-based scheme (*id*.).  At the same time Van Eperen and his new business coordinator were communicating with MassMutual, they were communicating with Hill, Netherland, and others about the process of getting the Karls policy approved and were receiving assistance in getting information to provide to MassMutual about the proposed policy (*id*. at ¶ 47).  Van Eperen failed to disclose to MassMutual that any sub-agents other than Hill were involved; he instructed Netherland not to communicate directly with MassMutual about the application and advised his new business coordinator that Hill should be the only agent on the application (*id*. at ¶¶ 48-49).

On May 4, 2011, Hill, through Van Eperen's agency, submitted an updated application and the required producer's statement on the Karls policy, both of which she signed as the soliciting producer (*id*. at ¶ 50).  Again, she omitted any reference to the use of the rejected Trifecta annuity-based financing structure 9 (*id*. at ¶ 56).  Additionally, in the producer's statement, she certified that she would receive 100% of the commissions on the policy, even though she intended to share the commissions with Netherland and others (*id*. at ¶¶ 53, 55).  By signing the producer's statement for the Karls Policy, Hill certified that: (a) "[t]he statements made in [the] Producer's Statement are true and accurate; (b) [e]ach question in the Application was asked of the Proposed Insured(s) and Proposed Owner(s) and accurately recorded; (c) she was "unaware of any suspicious or unusual activities … arising out of or in connection with[] the sale of [the] policy;" (d) she had "reported suspicious activity, if any, to the appropriate individuals; and (e) she was "unaware of any information that would adversely affect any of the Proposed Insured's eligibility, acceptability, or insurability" (Dkt. ¶ 52 and Ex. C).

One week later, on May 11, 2011, MassMutual approved the Karls policy with a face

value of $20 million, in reliance on the information provided by Hill and Van Eperen, including Hill's representation in the producer's statement that she would be the only agent receiving commissions on the policy, and absent the information that the policy would be financed using the rejected Trifecta annuity-based scheme (*id*. at ¶¶ 54-56). As a result of MassMutual's issuance of the Karls policy, MassMutual paid to Van Eperen more than $2 million in commissions and other compensation;[3] Van Eperen, in turn, paid a significant portion of the compensation to Hill, who, in turn, paid a significant portion to Netherland and others (*id*. at ¶ 57).

Several months later, on September 20, 2011, Hill, through Van Eperen's agency, submitted two applications for MassMutual life insurance for John Hart and Lita Hart, both of which she signed as the soliciting producer (*id*. at ¶¶ 60, 62). On September 22, 2011, Hill, again through Van Eperen's agency, submitted an application for MassMutual life insurance for Edith Sison, which she signed as the soliciting producer (*id*. ¶¶ 61-62). As was true with the Karls application, while the Hart and Sison applications disclosed that the proposed policies were to be premium financed, they did not mention that they were to utilize the Trifecta annuity-based structure that MassMutual had rejected only months earlier (*id*. at ¶ 60-62). In conjunction with the applications, Hill submitted the required producer's statements; in them, she indicated that she was the sole soliciting producer and would be receiving 100% of the commissions (*id*. at ¶ 62). Contrary to her representations, she intended to share her commissions with Netherland and another agent named Bill Lindsey (*id*.). Over the next few months while the applications were

---

[3] The amended counterclaim alleges that MassMutual made the payments both to Van Eperen directly and to "Mid-Atlantic," which it identifies as Van Eperen's wife's company (*id*. at ¶ 57). The distinction over whether MassMutual paid Van Eperen directly or through his wife's company is not material for purposes of this motion.

under MassMutual review, Van Eperen and his new business coordinator communicated with MassMutual underwriters in an effort to induce MassMutual to approve the applications and issue the Hart and Sison policies (*id*. at ¶ 63).  At the same time Van Eperen and his new business coordinator were communicating with MassMutual, they were communicating with Hill, Netherland and others in a joint effort to persuade MassMutual to issue the Hart and Sison policies (*id*. at ¶ 64).  In one email Hill sent to Van Eperen and Netherland on October 3, 2011, she identified Lindsey as the actual soliciting agent who would be receiving substantial commissions if the Hart and Sison policies issued (*id*. at ¶ 64).  She also acknowledged in the same email that the Hart and Sison policies would utilize the rejected Trifecta annuity-based scheme (*id*.).

On October 19, 2011, a MassMutual premium financing specialist, Josh Hazelwood – the same individual at MassMutual who sent the November 5, 2010 email to Netherland and Van Eperen rejecting the Trifecta structure "because of financial concerns … with our retail products as the principal funding mechanism" – informed Van Eperen that he would not approve the Hart and Sison policies as proposed, but that MassMutual might be able to approve the policies if the Harts and Sison, rather than premium financing the first year premiums, agreed to pay them themselves (*id*. at ¶¶ 37, 42, 67).  The insureds' out-of-pocket payment of those premiums, which represented hundreds of thousands of dollars, would evidence to MassMutual that they had a financial investment in and commitment to the policies (*id*. at ¶ 67).  Van Eperen subsequently informed Hazelwood and others at MassMutual that the Harts and Sison would pay the first year premiums themselves, but this information was false (*id*. at ¶¶ 68, 70).

On November 1, 2011, MassMutual approved the Hart policies, both with face values of $45 million, and the Sison policy, with a face value of $20 million, in reliance on the information

provided by Hill and Van Eperen, including Hill's representation in the producer's statements that she would be the only agent receiving commissions on the policies, and absent the information that the policies would be financed using the rejected Trifecta annuity-based structure (*id*. at ¶¶ 60-61, 69, 73-74).  Based on MassMutual's issuance of the Hart and Sison policies, MassMutual paid to Van Eperen more than $3 million in commissions and other compensation; Van Eperen, in turn, paid a significant portion of the compensation to Hill, who, in turn, paid a significant portion to Netherland and others (*id*. at ¶ 76).

On June 7, 2012, less than one year after their issuance, the Hart and Sison policies lapsed due to nonpayment of premiums (*id*. at ¶ 77).  Shortly thereafter, on July 17, 2012, approximately 14 months after its issuance, the Karls policy lapsed due to nonpayment of premiums (*id*. at ¶ 58).  MassMutual investigated the facts and circumstances surrounding the issuance of the four policies (*id*. at ¶ 78).  During MassMutual's investigation, Hill admitted that she herself did not complete any of the applications, but merely signed and forwarded them for processing by MassMutual (*id*.).  Hill also stated that she kept only approximately five to ten percent of the commissions MassMutual paid on the four policies, with the remainder being paid to sub-agents, including Netherland, who she failed to disclose on the producer's statements (*id*. at ¶ 79).  Hill provided MassMutual with an agreement she and Netherland had signed indicating that, among other things, Netherland was a "Co-Agent" on the Hart and Sison policies and that Netherland would receive sales commissions on the policies from Hill once Hill received the commissions from MassMutual (*id*.).  She provided a similar agreement she had entered into with Lindsey (*id*.).

B.  The Record

MassMutual has submitted the declaration of Kenneth Rickson, a Vice President and

Field Risk Officer for the company (Dkt. No. 95 at ¶ 1).[4]  Through this declaration, MassMutual asserts that its Producer Services group is located at its "home office" in Springfield, Massachusetts and paid the $6.6 million in commissions and related payments on the issuance of the four policies that are the subject of the counterclaim (*id*. at ¶ 6).

Rita Hill has submitted a declaration as well (Dkt. No. 86-1).[5]  In it, she attests to her residency in Tennessee, and advises the court that she has never lived or worked in the Commonwealth of Massachusetts, that she owns no real or personal property located in Massachusetts, that she has never been to Massachusetts for business reasons, and that the last trip she took to Massachusetts was a vacation more than 15 years ago (*id*. ¶¶ 2-6).  Hill discloses that she worked in the life insurance business from 2001 to 2014, during which time she had clients in Tennessee and about ten other states, not including Massachusetts (*id*. at ¶¶ 8, 11).  She never solicited life insurance business from a Massachusetts resident or completed a life insurance application for a Massachusetts resident, and the four individuals named in the policies that are the subject of the amended counterclaim were all residents of California (*id*. at ¶¶ 9, 19-21).  Hill acknowledges that she had to register with MassMutual in order to sell MassMutual products to her clients and that she entered into the career agent contract with Van Eperen that is attached to MassMutual's amended counterclaim (*id*. at ¶¶ 12, 18).  According to Hill, she was aware MassMutual had offices in Massachusetts, but all of her all of her MassMutual-related communications were directed to Van Eperen in Maryland, or to "Agency One," also in Maryland, and all of the MassMutual applications on which she worked were submitted to

---

[4] As counterclaim plaintiff, MassMutual bears the burden of establishing jurisdiction, as will be discussed more fully below.  *Phillips*, 530 F.3d at 25 n.1 (citing *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007).

[5] The court also considers facts put forward by the defendant to the extent they are not contradicted.  *Cossaboon v. Me. Med. Ctr.,* 600 F.3d 25, 31 (1st Cir. 2010).

Agency One in Maryland (*id*. at ¶¶ 15, 27-28).[6]

Hill professes to be of "very limited means;" other than her home and furnishings, for which she provides no value, she has less than $20,000 in total assets, and her income is less than $20,000 per year (*id*. at ¶ 30).  Following the death of her son in 2012, Hill helps to support her five year-old granddaughter financially (*id*. at ¶ 30).  According to Hill, due to her limited means and child care responsibilities, presumably for her granddaughter, she rarely travels far from home (*id*. at ¶ 31).  She indicates that during the last year, her one trip outside of Tennessee was to the neighboring state of Alabama, and, during the last three years, the farthest she has traveled is to a neighboring state (*id*. at ¶ 31).

III.   Discussion

A.  Personal Jurisdiction

Hill's first asserted ground for dismissal is lack of personal jurisdiction.  "On a motion to dismiss for want of *in personam* jurisdiction, Fed. R. Civ. P. 12(b)(2), the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists."  *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83 (1st Cir. 1997)).  "When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, … the 'prima facie' standard governs its determination."[7]  *United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 618 (1st Cir. 2001) (citing

---

[6] Agency One is not identified in the amended counterclaim, and while Hill references "Agency One" in her affidavit, she does not describe it.

[7] "In addition to the prima facie method, courts can apply the preponderance method or the likelihood method, both of which typically require an evidentiary hearing."  *Bluetarp Fin., Inc. v. Matrix Const. Co., Inc.*, 709 F.3d 72, 79 n.6 (1st Cir. 2013) (citing *Phillips*, 530 F.3d at 26 n.2).  The prima facie method is the most commonly used, *Boit*, 967 F.2d at 675, and both Hill and MassMutual agreed at oral argument that it is appropriate to use here.

*United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 987 F.2d 39, 43 (1st

Cir.1993) (*Pleasant St. I*); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992)).

> Under th[e] prima facie standard, "the inquiry is whether the plaintiff
> has proffered evidence which, if credited, is sufficient to support
> findings of all facts essential to personal jurisdiction." *Phillips*, 530
> F.2d at 26.  The plaintiff's properly documented evidentiary proffers
> are accepted as true for purposes of making the prima facie showing,
> and [the court] construe[s] the[ ] proffers in a light most favorable to
> plaintiff's jurisdictional claim. *Id*.  To the extent that they are
> uncontradicted, [the court] add[s] into the mix the facts put forward by
> the defendant. *Cossaboon,* 600 F.3d at 31.

*Bluetarp*, 709 F.3d at 79.

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal

court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the

forum state." *Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015) (quoting *Sawtelle v.*

*Farrell*, 70 F.3d 1381, 1387 (1st Cir.1995)).  "A district court may exercise authority over a

defendant by virtue of either general or specific jurisdiction." *N. Laminate Sales, Inc. v. Davis*,

403 F.3d 14, 24 (1st Cir. 2005) (quoting *Mass. Sch. of Law*, 142 F.3d at 34).  General jurisdiction

requires that the "defendant … have continuous and systematic contacts with the forum state,"

and "'broadly subjects the defendant to suit in the forum state's courts in respect to all matters,'

regardless of whether the matter before the court has anything to do with the defendant's

contacts with the state." *Bluetarp*, 709 F.3d at 79 (quoting *Cossaboon,* 600 F.3d at 31).  Specific

jurisdiction, on the other hand, "may only be relied upon where the cause of action arises directly

out of, or relates to, the defendant's forum-based contacts." *Cossaboon*, 600 F.3d at 31 (quoting

*Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994)).  "The plaintiff need not prove the existence of

both types of jurisdiction; either one, standing alone, is sufficient." *Harlow v. Children's Hosp.*,

432 F.3d 50, 57 (1st Cir. 2005) (citing *Mass. Sch. of Law*, 142 F.3d at 34). MassMutual invokes only specific jurisdiction here.

"The existence of specific personal jurisdiction depends upon the plaintiff's ability to satisfy two cornerstone conditions: 'first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution.'" *Foster-Miller v. Babcock & Wilcox Can.*, 46 F.3d 138, 145 (1st Cir. 1995) (quoting *Pritzker*, 42 F.3d at 60). While the First Circuit "previously has interpreted the Commonwealth's long-arm statute as coextensive with the outer limits of the Constitution," *A. Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58-59 (1st Cir. 2016) (citing *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 52 (1st Cir. 2002)), "in recent cases, [the court] ha[s] suggested that the Commonwealth's long-arm statute may impose limits on the exercise of personal jurisdiction 'more restrictive' than those required by the Constitution." *Id.* at 59 (citing *Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 4 (1st Cir. 2016); *Cossart v. United Excel Corp.*, 804 F.3d 13, 18-19 (1st Cir. 2015)). Nevertheless, this court need not "address this possible tension in [First Circuit] precedent here, … because [Hill] treat[s] the statutory and constitutional standards as identical and so ha[s] waived any argument that the long-arm statute does not reach as far as the [Fourteenth] Amendment allows."[8] *Copia Commc'ns*, 812 F.3d at 4. Thus, the court may

---

[8] Hill cites to *"Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 280 N.E.2d 423, 424 (Mass. 1972), for the proposition that the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3 extends to the full extent permitted by the Due Process Clause (Dkt. No. 86 at p. 5). In *"Automatic" Sprinkler*, the Supreme Judicial Court states, "[w]e see the function of the long arm statute as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States." *Id.* at 424.

"sidestep the statutory inquiry and proceed directly to the constitutional analysis." *Daynard*, 290 F.3d at 52.

The constitutional touchstone for personal jurisdiction is minimum contacts. *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992) (*Pleasant St. I*). "The minimum contacts standard requires that a court asserting personal jurisdiction determine that the nonresident defendant possesses sufficient contacts with the forum state so that subjecting him, her, or it to the forum's jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The First Circuit has recognized that "[t]he inquiry into minimum contacts is … highly idiosyncratic, involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case." *Pritzker*, 42 F.3d at 60 (citing *Pleasant St. I*, 960 F.2d at 1088; *Hahn v. Vermont Law Sch.*, 698 F.2d 48, 51 (1st Cir. 1983)). "In analyzing a defendant's contacts, the decisionmaker's attention must be focused on 'the relationship among the defendant, the forum, and the litigation.'" *Pleasant St. I*, 960 F.2d at 1088 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

To guide the inquiry, the First Circuit "divides [the] minimum contacts analysis into three inquiries: relatedness, purposeful availment, and reasonableness." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 9 (1st Cir. 2009) (alteration in original) (quoting *N. Laminate Sales*, 403 F.3d at 25).

> First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum. Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws. Third, if the proponent's case clears the first two hurdles, the court then must analyze the overall reasonableness of an exercise of jurisdiction in light of a

> variety of pertinent factors that touch upon the fundamental
> fairness of an exercise of jurisdiction.

*Swiss Am. Bank*, 274 F.3d at 620-21 (quoting *Phillips*, 196 F.3d at 288).  "An affirmative finding

on each of these elements is needed to support a specific jurisdiction finding."  *Bluetarp*, 709

F.3d at 80 (citing *Negrón–Torres v. Verizon Commc'ns, Inc.,* 478 F.3d 19, 24–25 (1st Cir.

2007)).

### (1) Relatedness

"The first inquiry, relatedness, asks whether 'the claim underlying the litigation …

directly arise[s] out of or relate[s] to, the defendant's forum state activities.'"  *Astro-Med*, 591

F.3d at 9 (alterations in original) (quoting *N. Laminate Sales*, 403 F.3d at 25).   "[T]he standard

for relatedness for a tort claim is typically different from that of a contract claim."  *Phillips*, 530

F.3d at 27 (citing *Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1 (1st Cir. 2002)).

For tort claims, the plaintiff must show a "sufficient 'causal nexus' between [the defendant's

contacts] with [the forum] and [the plaintiff's] causes of action."  *Jet Wine*, 298 F.3d at 7.  While

relatedness is the "least developed prong of the due process inquiry," *Swiss Am. Bank*, 274 F.3d

at 621, certain principles have been established.  Pertinent to this case, "a defendant 'need not be

physically present in the forum state to cause injury (and thus "activity" for jurisdictional

purposes) in the forum state,'" *Astro-Med*, 591 F.3d at 10 (quoting *N. Laminate Sales*, 403 F.3d

at 25), and so long as the injury is related to the plaintiff's claim, it can "satisfy[] the first prong

of the minimum contacts analysis."  *Id*.  Applying this principle to this case, MassMutual has

satisfied the relatedness requirement.  MassMutual has submitted evidence that it paid the $6.6

million in commissions and other payments that it claims as its damages from its home office in

Springfield, Massachusetts, thereby making out a prima facie case of in-forum injury resulting from the alleged fraud (Dkt. No. 95).[9]

An examination of First Circuit precedent supports this conclusion.  In *Astro-Med*, the plaintiff, a Rhode Island corporation, sued the defendant, a California corporation, in Rhode Island after the defendant hired one of the plaintiff's former employees in Florida.  *Id*., 591 F.3d at 9-10.  The plaintiff alleged that the former employee was in breach of the non-competition and non-disclosure provisions of his employment agreement and asserted claims against the defendant for tortious interference with contractual relations and misappropriation of trade secrets.  The defendant argued that it was not subject to personal jurisdiction in Rhode Island because the former employee was a Florida resident hired to work for it in Florida, and all of the defendant's dealings with him occurred either in his home state of Florida or in its home state of California.  The First Circuit succinctly rejected the argument.  The court first cited to the Supreme Court decision in *Calder v. Jones*, 465 U.S. 783, 789 (1984), for the principle that "a defendant 'need not be physically present in the forum state to cause injury (and thus "activity"

---

[9] Instead of in-forum injury, MassMutual bases its relatedness argument on a number of purported "direct contacts" Hill had with the forum in connection with the scheme, including submitting her application to register to sell MassMutual products through MassMutual's website, executing the career agent contract with Van Eperen, submitting the four life insurance applications, and providing follow-up information to Van Eperen during MassMutual's underwriting review process (Dkt. No. 97 at pp. 9-10).  Hill disputes that any of these actions constituted activity by Hill in Massachusetts (Dkt. No. 107 at p. 3).  The court is not a position to resolve the parties' disagreement about the jurisdictional significance of these acts because MassMutual has not come forward with competent evidence regarding them.  MassMutual relies on an affidavit from an associate with the law firm representing it in this litigation, but she is without personal knowledge as to Hill's actions; her knowledge is instead based on her review of client documents and what she has been told about the events underlying the lawsuit (Dkt. No. 93).  Her affidavit, therefore, cannot satisfy MassMutual's prima facie burden of establishing that any of the identified acts constituted direct contact by Hill with Massachusetts.

for jurisdictional purposes) in the forum state.'"[10]  *Astro-Med.*, 591 F.3d at 10 (quoting *N.*

*Laminate Sales*, 403 F.3d at 25).  From that premise, the court reasoned that "[the defendant's]

conduct in Florida and California was a cause of the breach of contract – the actual injury – that

occurred in Rhode Island.  That in-forum injury was clearly related to [the plaintiff's] tortious

interference claim, satisfying the first prong of the minimum contacts analysis."[11]  *Id.*

Similarly, in *N. Laminate Sales*, the plaintiff, a New Hampshire company, sued the

defendant, a New York resident, for "tortiously inducing [the defendant] to extend credit to the

company of which [the defendant] was an officer.  *Id.*, 403 F.3d at 25.  The defendant contended

that he was not subject to jurisdiction in New Hampshire because he made the allegedly

fraudulent and/or negligent misrepresentations concerning the creditworthiness of his company

during a meeting with the plaintiff in New York.  Again, the First Circuit cited *Calder*, 465 U.S.

at 789, for the principle that "a defendant need not be physically present in the forum state to

cause injury (and thus 'activity' for jurisdictional purposes) in the forum state."  *Id.*, 403 F.3d at

25.  The court then concluded that the plaintiff's "injury in New Hampshire incurred as a result

of [the defendant's] alleged tortious activity in New York could provide the basis for jurisdiction

in New Hampshire," and that the relatedness prong was satisfied because the plaintiff "would not

---

[10] In *Calder,* a California resident sued two Florida journalists in California claiming that they had libeled her in an article they wrote and edited in Florida and published in a national magazine.  *Id.*, 465 U.S. at 784.  Because the defendants "knew that the brunt of [the] injury would be felt by [the plaintiff] in the State in which she live[d] and work[ed] and in which the [magazine] ha[d] the largest circulation, *id.* at 789-90, the Court concluded that jurisdiction was "proper in California based on the 'effects' of [the defendants'] Florida conduct in California." *Id.* at 789.

[11] Hill attempts to distinguish *Astro-Med* on the ground that the employment agreement in that case had a clause designating Rhode Island as the exclusive forum for the company and the former employee to litigate disputes related to it, while Hill's contract with Van Eperen has no forum selection clause.   The forum selection clause, however, was not critical to the First Circuit's holding; only the in-forum injury was.  *Id.* at 10.

have extended further credit to [the defendant's company] but for [the defendant's] misrepresentations during the … meeting [in New York], and [the plaintiff's] injury is a direct result of this extension of credit.  *Id.  See also Sindi v. El-Moslimany*, No. 13-cv-10798-IT, 2014 WL 6893537, at *8 (D. Mass. Dec. 5, 2014) (finding the relatedness prong satisfied where the defendants' allegedly tortious conduct injured the plaintiff's reputation in Massachusetts); *Upromise, Inc. v. Angus*, No. 13-cv-12363, 2014 WL 212598, at *11 (D. Mass. Jan. 21, 2014) (finding the first prong of the jurisdictional analysis satisfied where, although the breach of contract and allegedly tortious conduct occurred in Florida, the injury was felt in Massachusetts).

The court also finds MassMutual's argument that "the claims arise out of Hill's activities in the forum because she aimed her tortious activity at, and harmed, a Massachusetts company" to be persuasive (Dkt. No. 97 at p. 10).  For this argument, MassMutual relies on *Levin v. Harned*, 304 F. Supp. 2d 136 (D. Mass. 2003).  In *Levin*, the plaintiffs, a married couple, brought contract and tort claims against their interior designer and five antiques dealers, who sold them antiques to decorate homes in Massachusetts and Rhode Island, alleging that the defendants had provided fraudulent descriptions of the furnishings making them appear to be worth far more than they actually were.  *Id*. at 142.  All five out-of-state antiques dealers moved to dismiss the claims against them for lack of personal jurisdiction in Massachusetts.  *Id*.  The court noted that the case presented "difficult questions under the 'relatedness' step of the due process analysis," but ultimately concluded that the plaintiffs had met their prima facie burden as to three of the dealers.  *Id*. at 150.

> [A]lthough the antique dealers made allegedly fraudulent representations to plaintiff's [interior designer] outside of the forum about the quality and value of certain antiques, they knew [the interior designer] would transmit the information to the [plaintiffs] in Boston, that the plaintiffs would rely on the descriptions in Massachusetts in making the purchasing decision

> and that the brunt of the financial injury from the alleged fraud
> would be suffered in Massachusetts. The tort was completed in
> Massachusetts where the reliance occurred and it caused damages
> in Massachusetts. As in *Calder*, the actual tort and injury, not just
> the consequences, occurred within the forum.

*Id*. As to the remaining two dealers, the court found that the plaintiffs had not presented a prima facie case that they had targeted Massachusetts residents where there was no evidence that they knew the purchasers of the antiques resided in Massachusetts or that was where they would receive the allegedly fraudulent descriptions. *Id*. at 141-42.

MassMutual likens Hill's actions to the actions of the three antiques dealers over whom the *Levin* court determined it had jurisdiction. The court finds the comparison apt. The record here establishes that Hill entered into a career agent contract with Van Eperen in which she agreed that her principal business activity would be to solicit applications for insurance and annuity products issued by MassMutual, which is prominently identified in the contract as a Springfield, Massachusetts company (Dkt. No. 17-2; Dkt. No. 86-1 at ¶¶ 12, 18). Moreover, in doing so, she understood that her compensation would consist of commissions paid by that Massachusetts company upon the issuance of those products (*id*.). Therefore, MassMutual has presented a prima facie case sufficient to satisfy the relatedness requirement that Hill targeted a Massachusetts company, regardless of her physical location at the time she made the allegedly fraudulent statements or omissions.

### (2) Purposeful Availment

The purposeful availment requirement ensures that jurisdiction is not based on "merely 'random, isolated or fortuitous' contacts with the forum state." *Adelson v. Hananel*, 510 F.3d 43, 50 (1st Cir. 2007) (quoting *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir. 1995)). The First Circuit has "called it akin to a 'rough quid pro quo,' that is 'when a defendant deliberately targets

a behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior." *Bluetarp*, 709 F.3d at 82 (quoting *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 555 (1st Cir. 2011)). "In the purposeful availment inquiry the focus is on the defendant's intentions, *Carreras*, 660 F.3d at 555, and the cornerstones are voluntariness and foreseeability." *Id.* (citing *Hannon v. Beard*, 524 F.3d 275, 284 (1st Cir. 2008)). *See also Adelson*, 510 F.3d at 50 (citing *Sawtelle*, 70 F.3d at 1391) ("The two key focal points of this concept are voluntariness and foreseeability."). "[T]here must be some voluntary action that [the defendant] has taken that should have put it fairly on notice that it might one day be called to defend itself in a [forum] court." *Jet Wine*, 298 F.3d at 11 (citing *Daynard*, 290 F.3d at 61). "The contacts must be voluntary and not based on the unilateral actions of another party." *Adelson*, 510 F.3d at 50 (citing Burger King, 471 U.S. at 475). "And, the defendant's contacts must be such that he could 'reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

The two requirements are easily met here. As established by Hill's own affidavit, she voluntarily registered with MassMutual and voluntarily entered into the Career Agent contract with Van Eperen in order to sell products offered by MassMutual to her clients, knowing that MassMutual had offices in Massachusetts (Dkt. No. 86-1 at ¶¶ 18, 28). *Cf. Ticketmaster-New York, Inc.*, 26 F.3d at 208 n.11 (noting that "a business relationship almost invariably entails some degree of initiative and forethought on the part of the persons involved, and, therefore, initiation and foreseeability are necessarily present). MassMutual did not initiate the contact. Moreover, as Rickson attests, MassMutual's "Home Office" is in Springfield, Massachusetts,

information which is stated on the applications for its life insurance policies and the policies themselves and is commonly understood within the industry (Dkt. No. 95 at ¶ 3).

(3) <u>Reasonableness</u>

The First Circuit generally considers five factors when assessing the reasonableness of a forum's exercise of personal jurisdiction:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies."

*Foster-Miller*, 46 F.3d at 150 (quoting *Pleasant St. Corp. .*, 960 F.2d at 1088). As explained by the court,

> We have called the points that compose this template "the gestalt factors" because, in any given case, they may neither be amenable to mechanical application nor be capable of producing an open-and-shut result. Their primary function is simply to illuminate the equitable dimensions of a specific situation, thereby "put[ting] into sharper perspective the reasonableness and fundamental fairness of exercising jurisdiction" in that situation. *Pritzker*, 42 F.3d at 64.

*Foster-Mill*er, 46 F.3d at 150. "The gestalt factors are not ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice." *Ticketmaster-New York, Inc.*, 26 F.3d at 209. The factors play a larger or smaller role depending on the strength or weakness of the plaintiff's minimum contacts showing. *Adelson*, 510 F.3d at 51. "[T]he weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994).

Consideration of the Gestalt factors supports the conclusion that jurisdiction in Massachusetts is reasonable. The first factor, burden on the defendant, "and its inevitable

concomitant, great inconvenience, are entitled to substantial weight in calibrating the

jurisdictional scales.  Indeed, the Court has stated that this element, alone among the gestalt

factors, is 'always a primary concern.'"  *Ticketmaster-New York, Inc.*, 26 F.3d at 210 (quoting

*Woodson*, 444 U.S. at 292).  However, "mounting an out-of-state defense most always means

added trouble and cost and therefore, 'this factor is only meaningful where a party can

demonstrate some kind of special or unusual burden.'"  *Bluetarp*, 709 F.3d at 83 (quoting

*Hannon v. Beard*, 524 F.3d 275, 285 (1st Cir. 2008)).  Hill lives in Tennessee and is

apparently limited financial means, owing in part to her provision of some degree of financial

support for her granddaughter following the death of her son in 2015.  "While those facts evoke

sympathy for the undeniable burden placed on [Hill], … no 'special or unusual burden' exist[s]

here."  *Adelson*, 510 F.3d at 51 (finding jurisdiction in Massachusetts reasonable where the

defendant lived and worked in Israel and was a legally blind diabetic).  As MassMutual correctly

notes, Hill has retained local counsel here, and litigation here will not require her to make a great

number of trips to Massachusetts.  While she might prefer to avoid the cost and burden of having

to travel to Massachusetts, she has not shown herself to be incapable of doing so.  Moreover,

"[o]ne reason that the factor of inconvenience weighs heavily in the jurisdictional balance is that

it provides a mechanism through which courts may guard against harassment."  *Ticketmaster-*

*New York, Inc.*, 26 F.3d at 211.  Here, it was Van Eperen who made the initial choice of forum,

so there is no basis for inferring that MassMutual has brought suit against Hill in Massachusetts

in order to harass her or cause her extra hardship.

Turning to the second factor, the forum has an interest in this matter's resolution.

Massachusetts has a recognized interest in redressing harms committed against its companies by

out-of-state residents, as well as in providing a convenient forum for its slighted residents.

*Bluetarp*, 709 F.3d at 83.  See also *Ticketmaster-New York*, 26 F.3d at 210 (citing *Keeton v.*

*Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984)) ("The forum state has a demonstrable interest

in exercising jurisdiction over one who causes tortious injury within its borders.").

 Both the third and fourth factors also weigh in favor of a finding of reasonableness.  As to

the third factor, "courts considering jurisdictional issues generally should 'accord plaintiff's

choice of forum a degree of deference in respect to the issue of its own convenience.'"  *Id.*

(quoting *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 211 (1st Cir. 1994)).  While the

court has recognized that Van Eperen originally chose the forum, MassMutual has an interest in

pursuing its claims against Van Eperen and his alleged co-conspirator in a single action in a

single forum.  See, e.g. *Mass. Mut. Life. Ins. Co. v. Residential Funding Co.*, 843 F. Supp. 2d

191, 212 (D. Mass. 2012) ("A single suit in Plaintiff's home state provides Plaintiff with the

opportunity for convenient and effective relief.").  Likewise, "the judicial system has an interest

in avoiding piecemeal litigation in multiple forums and allowing Plaintiff to bring [both] of these

cases in one forum would further this interest."  Id.

 The final gestalt factor requires the court to consider "the common interests of all

sovereigns in promoting substantive social policies."  *Foster-Miller*, 46 F.3d at 150 (quoting

*Pleasant St. Corp. .,* 960 F.2d at 1088).  "This factor is neutral since this case involves a personal

dispute and not policy issues."  *Sindi*, 2014 WL 6893537, at \*10.  With that, four of the five

gestalt factors weigh in favor of Massachusetts jurisdiction and the final is neutral, meeting the final prong of the jurisdictional analysis.

Thus, for all these reasons the court recommends that the District Court deny the motion to dismiss on the basis of lack of personal jurisdiction.

B. Venue

Hill's next asserted ground for dismissal is improper venue under Fed. R. Civ. P. 12(b)(3). "When an objection to venue has been raised, the burden is on the plaintiff to establish that venue is proper in the judicial district in which the action has been brought." *Transamerica Corp. v. Trans-Am. Leasing Corp.*, 670 F. Supp. 1089, 1090 (D. Mass. 1987). MassMutual maintains that venue is proper pursuant to 28 U.S.C. § 1391(b)(2), which provides that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *Id.* To determine whether a substantial part of the events or omissions giving rise to the claim occurred in Massachusetts, the court looks "not to a single 'triggering event,' prompting the action, but to the entire sequence of events underlying the claim." *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001) (quoting *First Mich. Corp. v. Bramlet*, 141 F.3d 260, 263-64 (6th Cir. 1998)). The relevant events for determining venue "need not be a point of dispute between the parties;" venue may be proper where a single event in the forum was "one part of the historical predicate for the instant suit," even though that single event was "not related to the principal question for decision." *Id.* at 42-43. "In addition, [the court] do[es] not focus on the actions of one party," but rather "takes a

'holistic view of the acts underlying a claim.'" *Astro-Med*, 591 F.3d at 12 (quoting *Uffner*, 244 F.3d at 43 n.6)).

Here, the court concludes that Massachusetts is a proper venue. As discussed, MassMutual's injury occurred in Massachusetts, making Massachusetts one of the places where the fraud occurred.[12] While Tennessee could be a proper venue, as Hill argues, this does not mean that Massachusetts is not, and the court is "not required to determine the best venue, merely a proper venue." *Id.* (citing *Uffner*, 244 F.3d at 42). In addition, Hill's argument that courts "frequently" find that personal jurisdiction exists in a state, but that venue is nevertheless improper there is not supported (Dkt. No. 107 at p.8 n.12). Hill cites to only one case, *Gill v. Nakamura*, No. 14-13621-NMG, 2015 WL 5074475, at *1 (D. Mass. Aug. 25, 2015), but in *Gill*, the court's subject-matter jurisdiction rested on the existence of a federal question, not diversity of citizenship. *Id.* at * 4. In that circumstance, the Fifth and not the Fourteenth Amendment applies, and the defendant need only have sufficient minimum contacts with the United States as a whole, not with a particular state. *Id.* at *4 (citing *Lorelei Corp. v. Cnty. of Guadalupe*, 940 F.2d 717, 719 (1st Cir. 1991)). Thus, the *Gill* court did not find that the defendant had minimum contacts with Massachusetts as Hill claims, but rather that the defendant had minimum contacts with the United States. *Id.* Moreover, the Gill court found that New Hampshire was a proper venue where the claims arose in connection with the defendant's alleged work for the plaintiff's company, a New Hampshire corporation, and "any damages resulting from the defendant's alleged conduct would be felt in New Hampshire." *Id.* at *5, 7. Thus, to the extent that *Gill* has

---

[12] Hill does not cite to any authority for her argument that harm occurring in a venue is insufficient to satisfy 28 U.S.C. § 1391(b)(2).

any applicability to this case, it supports a finding of venue in Massachusetts where MassMutual

felt its injury.

Accordingly, the court recommends that the District Judge deny Hill's motion to dismiss

for improper venue.

C.  Improper Joinder

Hill next seeks dismissal under Fed. R. Civ. P. 12(b)(4) and 12(b)(5) for insufficient

process and insufficient service of process, respectively.  Hill's argument is that MassMutual

failed to properly join her because she was not a party at the time MassMutual named her in its

amended counterclaim, and Fed. R. Civ. P. 13(a)(1) and (b), governing compulsory and

permissive counterclaims respectively, are limited to opposing parties.  To advance this

argument, however, Hill ignores Fed. R. Civ. P. 13(h), which provides that "Rules 19 and 20

govern the addition of a person as a party to a counterclaim or crossclaim …."  Fed. R. Civ. P.

13(h).  MassMutual identifies Rule 20(a)(2) as the basis for its joinder of Hill as a party; it

provides that "[p]ersons … may be joined in one action as defendants if: (A) any right to relief is

asserted against them jointly, severally, or in the alternative with respect to or arising out of the

same transaction, occurrence, or series of transactions or occurrences; and (B) any question of

law or fact common to all defendants will arise in the action," as the basis for its joinder of Hill

as a party.  Fed. R. Civ. P. 20(a)(2).

Hill does not dispute that Rule 13(h) applies or that both prongs of Rule 20(a)(2) are

satisfied, but she nevertheless raises a new objection, arguing that MassMutual was required to

file a motion for joinder (Dkt. No. 107 at pp. 10-11).  There is no leave requirement in Fed. R.

Civ. P. 13(h), but Hill posits that the general practice followed by courts in this district is to

require a motion and order.  As support, Hill cites two District of Massachusetts decisions in

which the courts note without discussion that the plaintiffs had filed motions for joinder.  *See
Abernathy v. Dickhaut*, No. 10-11504-MLW, 2014 WL 1338283, at *3 (D. Mass. Mar. 31,
2014); *Spencer v. Lewis*, No. 13-11528-MMB, 2014 WL 1364791, at *1 (D. Mass. Apr. 4,
2014).  The *Abernathy* and *Spencer* courts' observations that the plaintiffs in the cases before
them had filed joinder motions does not equate to a requirement that they have done so, and Hill
does not cite to any District of Massachusetts cases in which the court has imposed such a
requirement.  As MassMutual points out, some other districts have concluded the opposite,
holding that joinder motions are no longer necessary following a 1966 revision to Fed. R. Civ. P.
13(h), which dropped a provision that "the court shall order (additional parties) to be brought in."
*See Aleynikov v. Goldman Sachs Grp., Inc.*, No. 12-5994 (KM), 2013 WL 5816941, at *11
(D.N.J. Oct. 29, 2013); *Garmin Ltd. v. TomTom, Inc.*, No. 06-C-0062-C, 2006 WL 3377487, at
*2 (W. D. Wis. June 15, 2006); *Money Station, Inc. v. Elec. Payment Servs., Inc.*, No. C1-95-
098, 1996 WL 380703, at *7 (S.D. Ohio, Apr. 5, 1996).  Not to be deterred, Hill argues that,
even if Massachusetts courts agreed with this reading of the rule revision as eliminating the need
for joinder motions, it is limited to situations where new parties are brought in on counterclaims
raised in the original answer, and MassMutual did not name Hill in its original counterclaim.  For
support, Hill makes the attenuated argument that Rule 13(h) should be treated analogously to
Fed. R. Civ. P. 14(a)(1) governing third-party practice, which provides that "[a] defendant party
may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be
liable to it for all or part of the claim against it," "[b]ut the third-party plaintiff must, by motion,
obtain the court's leave if it files the third-party complaint more than 14 days after serving its
original answer."  Hill's argument goes that, because MassMutual filed its counterclaim with its
amended answer on September 12, 2014, more than 44 days after filing its counterclaim with its

original answer on August 11, 2014, MassMutual should have obtained leave.  This court rejects this strained reading of the rules, finding a more straightforward reading to suggest that MassMutual was not required to obtain leave.  Specifically, Fed. R. Civ. P. 15, which addresses amendments to pleadings, provides that a party is permitted to amend a "pleading" without leave of court "if the pleading is one to which a responsive pleading is required, [within] 21 days after service of a responsive pleading …."  Fed. R. Civ. P. 15(a)(1)(B).  Here, Van Eperen filed his answer to the counterclaim stated in MassMutual's original answer on September 12, 2014 (Dkt. No. 16).  Because MassMutual filed its amended answer with the instant counterclaim less than 21 days later on September 24, 2014 (Dkt. No. 17), MassMutual was not required to seek leave.

Accordingly, the court recommends that the District Judge deny Hill's motion to dismiss for insufficient process and service of process.

D.  <u>Motion to Dismiss for Failure to State a Claim</u>

Hill next argues that each of MassMutual's claims against her – for fraud, negligent misrepresentation, fraud in the inducement, and civil conspiracy – should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  She also argues that MassMutual's fraud-based claims fail to meet Fed. R. Civ. P. 9(b)'s heightened pleading requirement.

"To survive a motion to dismiss for failure to state a claim, 'a complaint must contain sufficient factual matter … to state a claim to relief that is plausible on its face.'"  *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 514 (1st Cir. 2016) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A plausibility inquiry is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679).  "In

evaluating whether a complaint states a plausible claim, [a court] "perform[s] [a] two-step

analysis." *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir.  2016) (third alteration in original)

(quoting *Cardigan Mtn. Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015)).

> At the first step, we "distinguish the complaint's factual allegations
> (which must be accepted as true) from its conclusory legal
> allegations (which need not be credited)." *Cardigan Mtn. Sch.*,
> 787 F.3d at 84 (quoting *García–Catalán v. United States*, 734 F.3d
> 100, 103 (1st Cir. 2013)).  At step two, we must "determine
> whether the factual allegations are sufficient to support the
> reasonable inference that the defendant is liable." *Id.* (quoting
> *García–Catalán*, 734 F.3d at 103) (internal quotation marks
> omitted).

*Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016).  "A motion to dismiss must focus not on

whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to

support the claims." *Prins v. Michaeles*, 15-40093-TSH, 2017 WL 631193, at * 2 (D. Mass. Feb.

15, 2017) (citing *Mitchell v. Mass. Dep't of Corr.*, 190 F. Supp. 2d 204, 208 (D. Mass. 2002)).

"Great specificity is ordinarily not required to survive a Rule 12(b)(6) motion." *Garita*

*Hotel Ltd. P'ship v. Ponce Fed. Bank*, 958 F.2d 15, 17 (1st Cir. 1992).  "However, an exception

to this general rule is codified in Fed. R. Civ. P. 9(b), which provides a heightened pleading

standard for fraud claims." *Bryan Corp. v. ChemWerth, Inc.*, 911 F. Supp. 2d 103, 108 (D. Mass.

2012) (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st

Cir. 2009)).  Rule 9(b) requires that '[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b)).  "The

particularity requirement means that a complaint must specify 'the time, place, and content of an

alleged false representation.'" *United States ex. rel. Kelly v. Novartis Pharm. Corp.*, 827 F.3d 5,

13 (1st Cir. 2016) (quoting *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996)).  *See also*

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004) (observing that claims for fraud typically must "specify the who, what, where, and when of the allegedly false or fraudulent representation"). "[T]he specificity requirement extends only to the particulars of the allegedly misleading statement itself." *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 15 (1st Cir. 2004) (citing *Educadores Puertorriqueños en Acción v. Hernández*, 367 F.3d 61, 66 (1st Cir. 2004)). "The other elements of fraud, such as intent and knowledge, may be averred in general terms." *Id.* (citing Fed. R. Civ. P. 9(b)). The rule is designed "to apprise the defendant of fraudulent claims and of the acts that form the basis for the claim." *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985).

      1. <u>Fraud</u>

      Under Massachusetts law, to recover for fraud the plaintiff must allege and prove "[1] that the defendant[] made a false representation of material fact, [2] with knowledge of its falsity, [3] for the purpose of inducing the plaintiff[] to act on this representation, [4] that the plaintiff[] reasonably relied on the representation as true, and [5] that [the plaintiff] acted upon it to [its] damage." *Cumis Ins. Society, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 47 (2009) (citing *Masingill v. EMC Corp.*, 870 N.E.2d 81, 88 (Mass. 2007)). *See also Rodi v. S.N.E. Sch. of Law*, 532 F.3d 11, 15 (1st Cir. 2008) (citing *Rodi*, 389 F.3d at 13; *Masingill*, 870 N.E.2d at 88). Hill argues that MassMutual fails to plead factual matter sufficient to support the first, fourth, and fifth elements, i.e. that MassMutual has failed to identify a false statement of material fact by Hill; that MassMutual has failed to allege plausible facts supporting its reasonable reliance on such a misrepresentation; and that MassMutual has failed to plead facts that would support an inference that any such misrepresentation caused harm to it. The court disagrees.

Under Massachusetts law, "there can be no actionable claim of fraud for failure to disclose in the absence of a duty to disclose." *Royal Bus. Grp., Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991) (citing *Solomon v. Birger*, 477 N.E.2d 137, 142, *rev. denied*, 481 N.E.2d 198 (1985)).  MassMutual has sufficiently alleged that Hill was under a duty to disclose based upon her agreement in her career agent contract to comply with all of MassMutual's rules in the carrying on of her business, including the rules set forth in its Producer Compliance Manual.  In addition, under Massachusetts law, "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party."  *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985).  Here, Hill is alleged to have made a partial disclosure regarding the presence of premium financing arrangements without disclosing the existence of annuity financing, which is alleged to have been misleading.

With respect to each of the four policies in issue, MassMutual has identified at least two documents Hill authored and signed that contain allegedly fraudulent misrepresentations or omissions – the application and the accompanying producer's statement for each policy.[13] According to MassMutual, in both the application and producer's statement for each policy, Hill stated that the policy would be premium-financed, but omitted the information that each would rely on the Trifecta annuity-based financing structure, the use of which MassMutual had just rejected.  MassMutual also alleges that Hill falsely claimed in each producer's statement that she would receive 100% of the commissions on the policies, despite the fact that she intended to

---

[13] Hill's argument that the applications and producer's statements were statements to Van Eperen and not MassMutual is specious.  Hill may have passed the documents through Van Eperen, but there is no question that the documents, applications for MassMutual life insurance, were intended for MassMutual.

share the commissions with Netherland and others and even had written agreements in place to

that effect.  Thus, MassMutual easily clears the hurdle of identifying the who, what, where and

when of the allegedly false statements, *Synopsys*, 374 F.3d at 29, and there is no basis for Hill to

argue that she has not been sufficiently apprised of the basis for the claim.[14]  *Hayduk*, 775 F.2d

at 443.

MassMutual also has alleged that it reasonably relied on Hill's misrepresentations and

omissions regarding the financing arrangements for the policies, Netherland's involvement, and

their commission splitting plans in deciding to approve and issue each of the policies.  Hill's

primary argument for why MassMutual has failed to allege plausible facts supporting reasonable

reliance is that she disclosed that premium financing was in place for each policy.  According to

Hill, this should have put MassMutual on notice that it needed to have its team of specialized

premium financing underwriters review the applications, which should have resulted in

MassMutual's uncovering the use of the annuity-based structure and its rejection of the

applications.  This argument ignores MassMutual's allegations that it did subject the applications

to scrutiny by its premium financing underwriters, but that Van Eperen and Hill deliberately hid

the use of the annuity-based structure throughout the underwriting review process, a structure

that Van Eperen and Hill already knew MassMutual would not have accepted.  In addition, the

---

[14] Hill also argues that she accurately and completely filled out the producer's statements when
she indicated that she would receive 100% of the commissions on the policies because she only
had to disclose MassMutual agents (which Netherland and Lindsey were not) who would receive
commissions and that the producer's statements represented only a preliminary disclosure.  To
the extent she did fill it out the producer's statements incorrectly, Hill maintains that any error
should be characterized as a good faith mistake rather than an intentional misrepresentation.
These arguments raise questions of fact regarding the purpose of the form and Hill's intent in
filling it out, which are not suitable for resolution on a motion to dismiss.  *See, e.g., Prins*, 2017
WL 631193, at *6 ("The issue of fraudulent intent … should be evaluated on the basis of a
factual record and cannot be decided on a motion to dismiss.").

issue of the reasonableness of MassMutual's reliance under these circumstances is a question of fact not suitable for resolution on a motion to dismiss. *See, e.g.*, *Mass. v. Mylan Labs.*, 608 F. Supp. 2d 127, 157 (D. Mass. 2008) (citing *Rodi*, 389 F.3d at 16) ("The reasonableness of reliance is a question of fact."); *Computer Sales Int'l, Inc. v. Lycos, Inc.*, No. 05-10017, 2005 WL 3307507, at *4 (D. Mass. Dec. 6, 2005) (same).

Finally, on the element of harm, MassMutual has alleged that it issued each of the four policies based on the inaccurate and incomplete information, including in the applications and producer's statements, regarding how the policies were to be financed and Netherland's involvement. Had MassMutual been aware of the annuities scheme and Netherland's involvement, it would have rejected the applications and not paid in excess of $6 million in commissions and other compensation, which it alleges it lost when the policies all lapsed within 15 months of issuance. Thus, MassMutual has sufficiently alleged harm resulting from Hill's fraud.

Accordingly, the court recommends that the district judge deny Hill's motion to dismiss MassMutual's fraud claim for failure to state a claim.

2. Negligent Misrepresentation

A claim for negligent misrepresentation lies where a defendant "(1) in the course of his business; (2) supplied false information for the guidance of others; (3) in their business transactions; (4) causing and resulting in pecuniary loss to those others; (5) by their justifiable reliance on the information, [where the defendant] (6) failed to exercise reasonable care or competence in obtaining or communicating the information." *Gossels v. Fleet Nat'l Bank*, 902 N.E.2d 370, 371-72 (Mass. 2009). The difference between fraud and negligent misrepresentation under Massachusetts law is that "negligent misrepresentation 'does not require

a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff.'" *Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker & Co., Ltd.*, 53 F. Supp. 3d 279, 300 (D. Mass. 2014) (quoting *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1031 n.25 (Mass. 2004)).  Rule 9(b)'s heightened pleading requirement for fraud claims does not apply to claims for negligent misrepresentation. *Masso v. United Parcel Serv. of Am., Inc.*, 884 F. Supp. 610, 615 (D. Mass. 1995).

As MassMutual notes in its opposition, Hill's argument for why its negligent misrepresentation claim should be dismissed simply paraphrases her argument for why its fraud claim should be dismissed.  But MassMutual has sufficiently alleged that Hill supplied false information, that MassMutual relied on that false information, and that it was thereby harmed. Accordingly, the court recommends that the district judge deny Hill's motion to dismiss MassMutual's claim for negligent misrepresentation for failure to state a claim.

3.  Fraud in the Inducement

The elements of a claim of fraud in the inducement are "(1) that the statement was knowingly false; (2) that [the Defendants] made the false statement with the intent to deceive; (3) that the statement was material to the plaintiffs' decision to sign the contract; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance." *Branch Ave. Capital LLC v. U.S. Bank Nat. Ass'n.*, No. 12-40140-TSH, 2013 WL 5242121, at * 7 (D. Mass. Sept. 16, 2013) (alteration in original) (citing *Zyla v. Wadsworth, Div. of Thomson Corp.*, 360 F.3d 243, 254 (1st Cir. 2004); *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 225 (1st Cir. 2003); *Turner v. Johnson & Johnson*, 809 F.2d 90, 95 (1st Cir. 1986)).  Hill argues that *Branch Ave.*, 2013 WL 5242121 at *7, creates an additional requirement that a claim for fraud in the inducement cannot lie absent a valid contract between

the parties, and, here, the contract she allegedly fraudulently induced MassMutual to enter was between it and the insureds, not it and her.  Hill's reliance on *Branch* is unavailing.  In *Branch*, the court granted summary judgment to the defendants on the plaintiff's fraud in the inducement claim not because there was no valid contract between the parties, but because no valid contract at all.  *Id*., 2013 WL 5242121, at *7.

Moreover, MassMutual directs the court to two cases, *Kenda*, 329 F.3d at 226-27, and *Parker v. Salo*, No. WOCV200902145, 2012 WL 7017166, at *4-5 (Mass. Super. Dec. 24, 2012), in which the courts recognized fraudulent inducement causes of action against defendants who, like Hill, were not parties to the contracts they allegedly fraudulently induced the plaintiffs to make.  Hill's attempt to distinguish these cases in her reply brief fails.  Hill argues that the *Kenda* court's decision affirming judgment for the plaintiff on its fraudulent inducement claim should be limited to instances where the non-contracting defendant is a director of the corporation and fraudulently induces the plaintiff to enter into a contract with that corporation, as was the case with the two individual defendants in *Kenda*.  The *Kenda* court does not discuss any such limitation, however, and Hill cites no authority for the proposition.  Hill argues that the *Parker* court, in denying a motion to dismiss the plaintiffs' fraudulent inducement claim where the "plaintiffs complain[ed] that they were fraudulently induced by the defendants to enter into a contract with [a third party]," mischaracterized a traditional fraud claim as a fraud in the inducement claim.  *Id*., 2012 WL 7017166, at *4-5.  Hill does not cite any authority for the claimed error by the *Parker* court.  In a fallback argument, Hill maintains that MassMutual's fraud in the inducement claim to the extent it parallels the claim in *Parker* should be dismissed as redundant of its fraud claim.  Hill, however, does not explain why the claim's being redundant, if it is, is grounds for dismissal under Rule 12(b)(6) for failure to state a claim.

However, "'a party may state as many claims as it has' in a complaint[.]" *Pine Polly, Inc. v. Integrated Packaging Films IPF, Inc.*, Civil Action No. 13-11302-NMG, 2014 WL 1203106, at *3 (D. Mass. Mar. 19, 2014) (quoting Fed. R. Civ. P. 8(d)(3)).[15]

Accordingly, the court recommends that the district judge deny Hill's motion to dismiss MassMutual's claim for fraudulent inducement for failure to state a claim.

4. Conspiracy

"'[T]o prove a civil conspiracy claim, the plaintiff must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement.'" *Blake v. Prof'l Coin Grading Serv.*, 898 F. Supp. 2d 365, 392 (D. Mass. 2012) (quoting *Boyle v. Barnstable Police Dept.*, No. 09-11435-MBB, 2012 WL 2126868, at *9 (D. Mass. June 11, 2012)).  Hill argues that MassMutual has failed to state a claim for civil conspiracy because it has failed to allege an underlying tortious act, but the court has concluded that MassMutual has stated claims for fraud, negligent misrepresentation, and fraud in the inducement.  Hill also argues that MassMutual has made only vague, conclusory allegations that the counterclaim defendants agreed to defraud MassMutual and has not identified any conversation, email exchange, phone call, or other communication in which the parties reached an agreement.  Civil conspiracy under Massachusetts law does not require an express agreement. *Fiorillo v. Winiker*, 85 F. Supp. 3d 565, 576 (D. Mass. 2015) (citing *Aetna Cas. Sur. Co. v. P &*

_____

[15] To the extent that Hill's concern with any overlap between the two claims is a concern about MassMutual obtaining an impermissible duplicate damages award if Hill were to be found liable on both theories of liability, the proper practice is to call for one single damages award on the verdict form at the time of trial.  *See, e.g., Guillemard-Ginorio v. Contreras-Gómez*, 585 F.3d 508, 533 (1st Cir. 2009) (holding that, assuming the plaintiffs' First Amendment and Equal Protection claims overlapped, defendants failed to show they suffered any prejudice where the verdict form called for single damages on all four of plaintiff's separate claims under the First Amendment and Equal Protection theories).

*B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994)).  Rather, liability can be predicated upon a

"'defendant's substantial assistance, with the knowledge that such assistance is contributing to a

common tortious plan.'"  *Koufos v. U.S. Bank, N.A.*, 939 F. Supp. 2d 40, 51 (D. Mass. 2013)

(quoting *Kurker v. Hill*, 689 N.E.2d 833 (Mass. App. Ct. 1998)).  MassMutual has sufficiently

alleged that Hill and Van Eperen knowingly provided substantial assistance to each other with

the knowledge that such assistance was contributing to a common plan to defraud MassMutual.

Accordingly, the court recommends that the district judge deny Hill's motion to dismiss

MassMutual's claim for civil conspiracy for failure to state a claim.

5.  Statute of Limitations

The parties agree that MassMutual's claims are subject to a three-year statute of

limitations.  Mass. Gen. Laws ch. 260, § 2A; *Albrecht v. Clifford*, 767 N.E.2d 42, 48 n.15 (Mass.

2002).  Hill is alleged to have submitted the Karls application and producer's statement in

December 2010, the Hart applications and producer's statements on September 20, 2011, and the

Sison application and producer's statement on September 22, 2011.  MassMutual filed its

amended counterclaim on September 24, 2014.  Hill argues that because more than three years

had passed since she submitted each application, MassMutual's claims are time-barred.

A cause or action in tort typically accrues at the time the plaintiff suffers the underlying

injury.  *Abdallah v. Bain Capital LLC*, 880 F. Supp. 2d 190, 195 (D. Mass. 2012) (citing

*Tagliente v. Himmer*, 949 F.2d 1, 4 (1st Cir. 1991); *Joseph A. Fortin Const., Inc. v. Mass. Hous.*

*Fin. Agency*, 466 N.E.2d 514 (Mass. 1984) ("[I]t is a well-settled rule that causes of action in tort

generally accrue under [Mass.] G[en]. L[aws] c[h]. 260, § 2A, at the time the plaintiff is

injured.")).  Here, MassMutual did not approve the policies until May 11, 2011 for the Karls

policy and November 1, 2011 for the Hart and Sison policies.  MassMutual does not allege the

precise dates that it paid the commissions and other compensation, but it does allege that it was after the policies were approved.  Thus, MassMutual did not rely on the alleged misrepresentations and omissions and was not injured as a result thereof until at least May 11, 2011 for the Karls policy and November 1, 2011 for the Hart and Sison policies.  As such, the statute of limitations for MassMutual's claims in connection with the Hart and Sison policies would have expired at the earliest on November 1, 2014, making them timely.

As for the Karls policy, absent tolling, the earliest that statute of limitations would have expired is May 11, 2014, over four months before MassMutual filed its amended counterclaim.

MassMutual maintains, however, that the statute of limitations was tolled under the discovery rule because the harm was "inherently unknowable," at least until MassMutual began investigating and discovered the fraud in December 2011.  "Under Massachusetts law, the discovery rule suspends the running of the statute of limitations where a cause of action is based on an 'inherently unknowable' wrong; the statute only starts to run when 'the harm becomes known, or in the exercise of reasonable diligence should have become known, to the injured party.'"  *Collins v. Nuzzo*, 244 F.3d 246, 253 (1st Cir. 2001) (quoting *Catrone v. Thoroughbred Racing Ass'n*, 929 F.2d 881, 885 (1st Cir. 1991)).  *See also Nat'l Ass'n of Gov't Emps. v. Mulligan*, 854 F. Supp. 2d 126, 131 (D. Mass. 2012) (citing *Pagliuca v. City of Boston*, 626 N.E.2d 625, 628 (Mass. App. Ct. 1994)) ("Causes of action sounding in tort … accrue either when the plaintiff is injured as a result of the defendant's unlawful act, or, if the wrong is 'inherently unknowable,' when the plaintiff knows or should have known that it has been injured.").  "To prevail on a statute of limitations defense at the motion to dismiss stage, 'the facts establishing that defense must: (1) be definitively ascertainable from the complaint and other allowable sources of information; and (2) suffice to establish the affirmative defense with

certitude.'"  *Id*. at 131 (quoting *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008)).  "If the applicability of the … inherently unknowable wrong exception[] turn[s] on disputed issues of fact, those facts 'must be resolved by a jury.'"  *Id*. at 131 (quoting *Taygeta Corp. v. Varian Assocs., Inc.*, 763 N.E.2d 1053, 1063 (Mass. 2002)).  Given the surreptitious nature of the scheme, MassMutual's claim might well qualify as "inherently unknowable."  The court need not decide this issue at this stage of the litigation, however, because the facts establishing the defense are neither definitively ascertainable from the amended counterclaim, nor sufficient to establish the affirmative defense with certitude.  *See, e.g., id.*

IV.   Conclusion

For these reasons, it is this court's RECOMMENDATION that Hill's motion to dismiss be DENIED in its entirety.[16]

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED:  February 28 , 2017

---

[16] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within fourteen (14) days of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.